UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BARRY SEPULVEDA,

        Plaintiff,

- against -

CITY OF NEW YORK, *et al.*,

        Defendants.
-------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
15-CV-5187 (RRM) (CLP)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

    Plaintiff Barry Sepulveda brings this § 1983 action against the City of New York, New York City Police Department ("NYPD") Officers Ricky Alexander, Danny Golat, and Sean Haggerty, and NYPD Sergeant Michael DiCecco, alleging that defendants violated his rights under the Fourth Amendment to the Constitution by subjecting him to a visual body cavity search and hospitalizing him for six days following a traffic stop. Defendants now move for summary judgment. For the reasons set forth below, defendants' motion for summary judgment is granted.

## BACKGROUND

**I.    Background Facts**

    Unless otherwise noted, the following facts are undisputed and are drawn from the parties' Local Rule 56.1 statements or from deposition testimony submitted by the parties.

    On the evening of March 26, 2014, plaintiff Barry Sepulveda was getting a ride home in his friend's Nissan Murano, having just left a Best Buy store in Staten Island. (Defendants' Statement of Undisputed Facts ("Defs.' Rule 56.1 Stmt.") (Doc. No. 64) ¶ 6; Plaintiff's Statement of Material Disputed Facts ("Pl.'s Rule 56.1 Stmt.") (Doc. No. 67) ¶ 6; Stein Decl., Ex. A and Ohene Decl., Ex. 1 ("Sepulveda Dep.") (Doc. Nos. 65, 68-1) at 39, 42.) Sepulveda

and his friend were headed toward Sepulveda's home at 68 Targee Street, also in Staten Island. (Defs.' Rule 56.1 Stmt. ¶¶ 5–6; Pl.'s Rule 56.1 Stmt. ¶¶ 5–6.) Before they reached Sepulveda's home, Sepulveda and his friend were pulled over by NYPD officers. (Defs.' Rule 56.1 Stmt. ¶ 7; Pl.'s Rule 56.1 Stmt. ¶ 7.) Officer Alexander testified that he was in the car along with Sergeant DiCecco, Officer Golat, and Officer Haggerty. (Stein Decl., Ex. B ("Alexander Dep.") (Doc. No. 65-2) at 12; *see also* Sepulveda Dep. at 45, 51 (testifying that there were four officers in the patrol car)).

According to Alexander, one of the officers signaled to Sepulveda's friend to pull over by turning on the lights. (Alexander Dep. at 23.) The car did not immediately pull over, but instead drove "one to two blocks" before stopping. (*Id.*) Alexander testified that after Sepulveda's friend pulled over, the officers stopped in front of Sepulveda's friend's car and all four officers got out. (*Id.* at 23.) Alexander testified that he approached the front passenger window of the car, where Sepulveda was sitting, and saw Sepulveda with a "clear plastic bag with a white substance in it." (*Id.* at 27, 36.) Alexander "asked [Sepulveda] to step out of the vehicle," but Sepulveda refused. (*Id.* at 36.) Alexander repeatedly ordered Sepulveda to step out of the car and pulled the handle of the car door, but it would not open. (*Id.*) Watching through the car window, Alexander "observed [Sepulveda] shove [the plastic bag] into his butt." (*Id.* at 37; *see also* Defs.' Rule 56.1 Stmt. ¶¶ 9–11.) According to Alexander, he watched through the car window as Sepulveda "leaned forward" and with his right hand reached "[i]nto his butt area down his pants" with the plastic bag in his hand. (Alexander Dep. at 38.) Alexander testified that, at the time, he "didn't know" whether Sepulveda was reaching for a weapon. (*Id.* at 39.) According to Alexander's testimony, the car door eventually opened and he pulled Sepulveda

2

from the car. (*Id.* at 36–37.) Alexander testified that he did not ask the other officers if they had seen the clear plastic bag. (*Id.* at 62.)

Sepulveda describes a very different traffic stop. According to Sepulveda, the traffic stop was initiated when an unmarked car cut off the car he was riding in – and that no lights or siren were used. (Sepulveda Dep. at 43.) Sepulveda testified that, after being pulled over, all four "officers got out [of the car] with their guns drawn." (*Id.*) "[T]wo Caucasian officers approached [Sepulveda's] side of the vehicle" with guns drawn, pulled him from the car, and beat him. (Pl.'s Rule 56.1 Stmt. ¶¶ 7–10.) Sepulveda testified that his windows were rolled up and the doors were unlocked. (Sepulveda Dep. at 45.) According to Sepulveda, the officers were not in uniform. (*Id.*)

Sepulveda "denies that he had any drugs in his hands when the police approached his vehicle and opened his door." (Pl.'s Rule 56.1 Stmt. ¶ 10.) According to Sepulveda, "his hands were in front of him" when officers approached the car. (*Id.* ¶ 11; Sepulveda Dep. at 46–47.) He denies inserting a plastic bag into his rectum. (*Id.* ¶ 12; Sepulveda Dep. at 47.) With respect to the driver of the vehicle, Sepulveda alleges in his amended complaint that Officer Golat "forcibly pulled the driver out of the vehicle" and Officer Haggerty assisted Officer Golat in doing so. (Am. Compl. (Doc. No. 33) ¶ 17.)

Officers searched the vehicle and recovered a gravity knife. (Defs.' Rule 56.1 Stmt. ¶ 13.) Sepulveda testified that he knew a knife was found in the car and that the knife was the basis for his arrest, but that he had "never seen the knife." (Sepulveda Dep. at 47.) Sepulveda was arrested and eventually charged with illegal possession of a gravity knife. (Alexander Dep. at 105.)

3

Sepulveda was transported back to the NYPD's 121st Precinct. (Defs.' Rule 56.1 Stmt. ¶ 14; Pl.'s Rule 56.1 Stmt. ¶ 14.) Sergeant DiCecco was the supervisor while Sepulveda was at the precinct. (Defs.' Rule 56.1 Stmt. ¶ 17; Pl.'s Rule 56.1 Stmt. ¶ 17.) Officer Alexander testified that, while in the "cell area" of the precinct, either he or another officer "asked [Sepulveda] if he wanted to remove" the plastic bag from his rectum "for his safety," but that Sepulveda "wouldn't do it." (Alexander Dep. at 62–63; Defs.' Rule 56.1 Stmt. ¶ 15.) Sergeant DiCecco testified, "I observed [Sepulveda] place an already existing object further up into his rectum in the Arrest Processing Room." (Stein Decl., Ex. E ("DiCecco Dep.") (Doc. No. 65-5) at 38–39.) Sepulveda denies both that he was given the opportunity to remove any drugs from his rectum and that he responded by pushing them further into his rectum. (Pl.'s Rule 56.1 Stmt. ¶ 15.)

The parties agree that Sepulveda was strip searched at the precinct. (Defs.' Rule 56.1 Stmt. ¶ 14; Pl.'s Rule 56.1 Stmt. ¶ 14.) Specifically, Sepulveda testifies that he was subjected to a visual body cavity search – he was asked to take off his clothes, squat, and bend over while police officers "look[ed] for something." (Sepulveda Dep. at 54–55.)

Defendants maintain that they decided to send Sepulveda to the hospital for his safety. (Defs.' Rule 56.1 Stmt. ¶ 16.) Officer Alexander testified that the officers were concerned the bag of drugs might rupture inside Sepulveda and kill him, but did not recall who specifically called for the ambulance. (Alexander Dep. at 76.)

Sepulveda denies that he was taken to the hospital for his safety. (Pl.'s Rule 56.1 Stmt. ¶ 16.) He emphasizes that defendants first took him to the precinct and searched him instead of immediately transporting him to the hospital. (*Id.*) Sepulveda maintains he had no idea why defendants were calling the ambulance while he was at the precinct. (*Id.* ¶ 19.)

An ambulance took Sepulveda to Richmond University Medical Center. (Defs.' Rule 56.1 Stmt. ¶ 16; Pl.'s Rule 56.1 Stmt. ¶ 16; Stein Decl., Ex. D ("Medical Records") (Doc. No. 65-4).) Defendants maintain that Sepulveda told ambulance staff "that he 'shoved a quarter sized bag of cocaine up his rectum.'" (Defs.' Rule 56.1 Stmt. ¶ 18.) The Prehospital Care Report Summary completed by the Fire Department reads, "[Sepulveda] stated to crew and officer that he shoved a quarter sized bag of cocaine up his rectum." (Prehospital Care Report Summary (Doc. No. 65-3) at 3.)[1] Sepulveda denies speaking with ambulance staff. (Pl.'s Rule 56.1 Stmt. ¶ 18.)

Sepulveda's hospital records state that Sepulveda told hospital staff that "he put 5-8 bags [of cocaine] in his rectum." (Medical Records at 2; Defs.' Rule 56.1 Stmt. ¶ 10.) Sepulveda denies making this statement and responds that "he has no idea why the records say that." (Pl.'s Rule 56.1 Stmt. ¶¶ 20–21.) The hospital records also reflect that an abdominal x-ray revealed "[f]oreign bodies in [Sepulveda's] rectum surrounded by air bubble [sic]." (Defs.' Rule 56.1 Stmt. ¶ 23; Medical Records at 7.) Sepulveda says he "can neither admit nor controvert the allegation." (Pl.'s Rule 56.1 Stmt. ¶ 23.) Dr. Gisel Cubero completed a Physician Notes document on March 26, 2014, reading, "Based upon my evaluation of the patient, I feel inpatient admission is required; as the patient is a 27 year-old-M with no past medical history. Admission is necessary for drug packet ingestion per rectum, as rupture of packets leading to life threatening condition including fatal arrhythmia, myocardial infarction, CVA, is possible without further evaluation." (Defs.' Rule 56.1 Stmt. ¶ 22; Medical Records at 4.)

According to defendants, hospital staff told Sepulveda about the dangers of keeping cocaine in his rectum, but Sepulveda refused to drink laxatives, be touched, or have hospital staff

---

[1] Except for citations to depositions, page numbers correspond to pagination from the Court's Electronic Case Filing System.

5

attempt to remove anything from his rectum. (Defs.' Rule 56.1 Stmt. ¶¶ 23–25.) Sepulveda confirms that he was told about the dangers of having cocaine in his rectum, but denies that he refused to drink laxative – he says he "did drink some" – and also denies that he refused to be touched or to have hospital staff remove anything from his rectum. (Pl.'s Rule 56.1 Stmt. ¶¶ 24–25; Sepulveda Dep. at 72.)

Sepulveda testifies that, while he was in an "observation room" at the hospital, one of the officers entered the hospital room and told Sepulveda that if he had "something on [him] to give it to them because if [he didn't] give it to them [he was] going to be charged with tampering which is a felony." (Sepulveda Dep. at 69.) Sepulveda told the officer he did not "have anything to give" him. (*Id.*) According to Sepulveda, a doctor at the hospital said he would let Sepulveda leave "if it was up to him," as Sepulveda "was wasting space in the hospital," but "the officers [were] holding [Sepulveda] there." (*Id.* at 80.) Sepulveda testifies the officers told him they were holding him at the hospital. (*Id.*) Defendants maintain that it was the hospital's decision to admit Sepulveda "and there is no evidence that any member of the NYPD ordered a search of any kind." (Defs.' Rule 56.1 Stmt. ¶ 27.) Officer Alexander testified that if drugs had been found in Sepulveda's rectum during his time in the hospital, he "would have charged [Sepulveda] with possession." (Alexander Dep. at 108.) Sepulveda says he cannot admit or controvert this allegation, but does maintain that defendants "orchestrate[d] the search of his body cavity conducted by the hospital." (Pl.'s Rule 56.1 Stmt. ¶ 27.)

The parties agree that cocaine was never recovered from Sepulveda. According to defendants, Sepulveda eventually had a bowel movement which produced no bags of cocaine. (Defs.' Rule 56.1 Stmt. ¶ 26; Pl.'s Rule 56.1 Stmt. ¶ 26.) Afterward, his abdominal x-ray showed no foreign body. (Defs.' Rule 56.1 Stmt. ¶ 26; Pl.'s Rule 56.1 Stmt. ¶ 26.) Sepulveda

was discharged on March 31, 2014 – five days after entering the hospital. (Defs.' Rule 56.1 Stmt. ¶ 26; Pl.'s Rule 56.1 Stmt. ¶ 26.) After leaving the hospital, Sepulveda was taken to a different police precinct, fingerprinted and photographed, and then taken to court to be arraigned. (Defs.' Rule 56.1 Stmt. ¶ 29; Pl.'s Rule 56.1 Stmt. ¶ 29; Sepulveda Dep. at 87–88.)

## II.     Complaint

Sepulveda filed his original complaint in this action on September 8, 2015. (Compl. (Doc. No. 1).) The complaint brought § 1983 claims against the City of New York and Officer Alexander alleging that Sepulveda was unlawfully searched at the 121st Precinct on May 26, 2014, and later unlawfully searched at the Richmond University Medical Center, in violation of his rights under the Fourth Amendment to the Constitution. (Compl. ¶¶ 11–27.) Sepulveda was subsequently granted permission to file an amended complaint. (Doc. No. 36.) That pleading added Officer Golat, Officer Haggerty, and Sergeant DiCecco as defendants and is now the operative pleading in this action.[2] (Am. Compl.)

Sepulveda first brings a § 1983 claim alleging he was subjected to an unlawful search at the 121st Precinct. Specifically, Sepulveda alleges that the defendant police officers conducted a visual body cavity search without probable cause, in violation of Sepulveda's rights under the Fourth Amendment to the Constitution. (Am. Compl. ¶¶ 17–27.) Second, Sepulveda brings a § 1983 claim based on his detention at the hospital, alleging that he was subjected to an unlawful search by the hospital at the direction of the officers. (Am. Compl. ¶¶ 28–39.)

Sepulveda's amended complaint is somewhat unclear as to whether he challenges his treatment as unlawful pretrial punishment under the Fourteenth Amendment or as unlawful search and seizure without probable cause under the Fourth Amendment. He writes, "That the

---

[2] Although the amended complaint identifies Sergeant DiCecco as Sergeant "Dicecco," the Court adopts the spelling used in plaintiff's and defendants' filings. (*See, e.g.*, Pl.'s Rule 56.1 Stmt. ¶ 17; DiCecco Dep.)

7

act of detaining Plaintiff, Barry Sepulveda, at the hospital for six (6) days, for a body cavity search without a search warrant from a judge or magistrate, constitutes cruel and inhuman treatment."  (Am. Compl. ¶ 35.)  However, Sepulveda clarifies in his opposition brief that he brings this claim under the Fourth Amendment, alleging an unlawful search: "Plaintiff Barry Sepulveda brings this action alleging a violation of his Fourth Amendment rights in that he was forced to stay at Richmond University Medical Center for six (6) days with police officers stationed at the entrance of his hospital room so that a manual body cavity search including x-rays could be performed on him, without his consent and without a search warrant."  (Pl.'s Memorandum in Opposition to Motion for Summary Judgment ("Opp. Mot.") (Doc. No. 66) at 1.)

### III.   Motion for Summary Judgment

Defendants filed their motion for summary judgment on July 26, 2019.  (Notice of Motion (Doc. No. 62).)  First, defendants argue that the Court must find that Sepulveda in fact inserted drugs into his rectum.  (Defs.' Memorandum of Law in Support of Motion for Summary Judgment ("Mot.") (Doc. No. 63) at 7–10.)  According to defendants, in light of the objective medical evidence supporting the conclusion that Sepulveda had drugs in his rectum, and Sepulveda's reliance on his own testimony to dispute this fact, the Court must find that no reasonable juror could conclude that he did not insert drugs into his rectum.  (*Id.*)

Most of defendants' subsequent arguments are predicated on a finding that no reasonable juror could credit Sepulveda's denial that he inserted drugs into his rectum.  First, defendants argue that the Court's finding of fact with respect to Sepulveda's conduct would support summary judgment on Sepulveda's challenge to the search at the precinct.  So long as the Court finds that Sepulveda was observed inserting a bag of suspected drugs into his rectum, defendants

8

maintain, the Court can conclude there was reasonable suspicion supporting Sepulveda being subjected to a search at the precinct. (*Id.* at 10–11.)

Recognizing the ambiguity as to whether Sepulveda brought his second cause of action under the Fourth or Fourteenth Amendment, defendants first argue that involuntary hospitalization claims are cognizable only under the Fourth Amendment, and that Sepulveda's Fourteenth Amendment Due Process claim based on his hospitalization must be dismissed as duplicative. (*Id.* at 11–12.) Then, advancing the same argument used to oppose Sepulveda's first cause of action, defendants argue that Sepulveda's involuntary hospitalization was supported by probable cause given the fact that "he inserted cocaine into his anus." (*Id.* at 12.) Alternatively, defendants argue that Sepulveda's hospitalization was supported by probable cause under Section 9.41 of the New York Mental Hygiene Law because Sepulveda was at risk of seriously harming himself by inserting cocaine into his rectum. (*Id.* at 13.) Defendants also argue that medical records demonstrate that it was the decision of hospital medical personnel, not defendant police officers, to admit Sepulveda to the hospital, hold him there, and seek to obtain the drugs inside Sepulveda. (*Id.* at 12–13.)

Finally, defendants argue that claims against Officers Golat and Haggerty must be dismissed because Sepulveda fails to plead facts establishing their personal involvement in the alleged events. (*Id.* at 14.)

In response, Sepulveda disputes that any of the defendant officers observed him inserting a bag of drugs into his rectum, describing defendants' account of the event as "patently unreasonable and physically impossible" based on the unlikelihood that officers would watch this occurring "without drawing their guns" and the physical difficulty of inserting drugs into one's own rectum "while seated." (Opp. Mot. at 5.) Sepulveda next argues that defendants'

9

decision to transport Sepulveda to the hospital constituted an unconstitutional search because the defendant police officers "cause[d] the removal of an object from an arrestee's body without first obtaining a search warrant." (*Id.*)  Sepulveda maintains that the search at the precinct was unlawful because there could not have been a "clear indication" that evidence would be found, as Sepulveda argues is required under the Fourth Amendment to the Constitution. (*Id.* at 5–6.)

In reply, defendants reiterate that the Court should find that Sepulveda inserted drugs into his rectum, as no reasonable jury could conclude to the contrary based on the evidence presented. (Defs.' Reply Memorandum in Support of Motion for Summary Judgment ("Reply") (Doc. No. 69) at 6–9.)  Next, defendants argue that transporting Sepulveda to the hospital was not a violation of Sepulveda's Fourth Amendment rights because the defendant officers sent Sepulveda to the hospital out of a legitimate concern for Sepulveda's safety. (Reply at 9–11.)  Finally, defendants note that Sepulveda did not oppose defendants' argument that the search of Sepulveda before transporting him to the hospital was constitutional or defendants' argument that Officers Golat and Haggerty are entitled to summary judgment because Sepulveda presents no facts tying them to the events at issue. (Reply at 8–9.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the

court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004).

Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

### I. Applicable Law

#### A. Fourth Amendment Protections Against Unreasonable Searches and Seizures

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A search occurs when the Government acquires information by either 'physically intruding on persons, houses, papers, or effects,' or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014), *on reh'g en banc*, 824 F.3d 199 (2d Cir. 2016) (quoting *Florida v.*

*Jardines*, 569 U.S. 1, 5 (2013)). "A 'seizure' occurs where, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). It is "well-established" that Fourth Amendment protections "extend to prisoners and pretrial detainees." *Holland v. City of New York*, 197 F. Supp. 3d 529, 542 (S.D.N.Y. 2016).

"[W]arrantless searches are *per se* unreasonable, subject only to a few specifically delineated and well-recognized exceptions." *New Jersey v. T.L.O.*, 469 U.S. 325, 354 (1985) (Brennan, J., concurring). Where law enforcement conducts a warrantless based on an emergency circumstance and "[a]bsent th[e] established justification" provided by a warrant, "the fact-specific nature of the reasonableness inquiry demands that [courts] evaluate each case of alleged exigency based on its own facts and circumstances." *Missouri v. McNeely*, 569 U.S. 141, 150 (2013) (internal citations and quotation marks omitted).

> The term "strip search" is often used to describe a number of distinct searches:
>
> (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2013).

Even following an arrest of a person for a felony offense, police must have "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity" in order to conduct a visual body cavity search. *Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019) (quoting *People v. Hall*, 10 N.Y.3d 303, 311 (2008)). When "an arresting officer has reason to believe, based on specific and articulable facts, taken

12

together with rational inferences from those facts, that an arrestee is secreting contraband inside a body cavity, then the officer is permitted to conduct a visual body cavity search." *Id.* (internal citations and quotation marks omitted).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation and internal quotation marks omitted). "Personal involvement can be shown by evidence that the defendant 'participated directly in the alleged constitutional violation'; or that the defendant acted in a supervisory capacity by creating a policy or custom under which violations occurred, by negligently supervising subordinates, or by failing to act or remedy wrongs after being aware of them." *Anderson v. City of New York*, 817 F. Supp. 2d 77, 93 (E.D.N.Y. 2011) (quoting *Colon*, 58 F.3d at 873).

Finally, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Frith v. City of New York*, 203 F. Supp. 3d 386, 391 (S.D.N.Y. 2016) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)) (internal quotation marks omitted).

### B. Factual Disputes at the Summary Judgment Stage

At the summary judgment stage, plaintiffs often rely on their sworn testimony to establish a material issue of fact. Because a court at the summary judgment stage must draw all "reasonable" and "justifiable" inferences in favor of the non-moving party, a plaintiff's testimony is often sufficient to establish a material issue of fact precluding summary judgment. *See Anderson*, 477 U.S. at 255. Where, however, a court finds that "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete

13

testimony," a court may conclude that no reasonable juror would believe the plaintiff's testimony. *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005). So, while district courts are not to "engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment," they may, "in certain extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast up on their plausibility,'" grant summary judgment despite the fact that doing so requires finding contrary to the plaintiff's sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys*, 426 F.3d at 555). At the same time, as the Second Circuit recently explained in *Bellamy v. City of New York*, where a non-movant's testimony is "consistent and uncomplicated," is not "wholly improbable," and is supported by the record, self-serving testimony should not be disregarded on summary judgment. 914 F.3d 727, 746 (2d Cir. 2019).

**II.     Factual Dispute Regarding Whether Sepulveda Inserted Drugs into His Rectum**

Given the substantial evidence contradicting Sepulveda's testimony, no reasonable jury could conclude that Sepulveda did not insert drugs – or something that appeared to be a plastic bag containing drugs – into his rectum on March 26, 2014. In arguing that the Court must reject Sepulveda's account of events, defendants analogize this case to *Jeffreys*, in which the district court's grant of summary judgment was affirmed after it disregarded plaintiff's sworn testimony that he had not jumped out of a window and was instead thrown out by police. *Jeffreys*, 426 F.3d at 551–53. (Mot. at 8–9.) Plaintiff Jeffreys's sworn testimony was substantially contradicted by admissions he had apparently made to medical staff, doctors' reports of his injuries, and police officers' accounts of the incident. *Id.*

As in *Jeffreys*, here defendants point to a variety of evidence that contradicts Sepulveda's testimony. Defendants provide sworn testimony from Officer Alexander stating that he observed

14

Sepulveda insert a plastic bag into his rectum. (Alexander Dep. at 36–38.) They also provide testimony from Sergeant DiCecco, who separately testifies that he observed Sepulveda "place an already existing object further up into his rectum in the Arrest Processing Room." (DiCecco Dep. at 38–39; Alexander Dep. at 62–63.) Beyond the testimony of these officers, defendants present medical evidence that Sepulveda told ambulance staff and hospital staff that he had cocaine in his rectum, (Prehospital Care Report Summary at 3; Medical Records at 2), that Sepulveda's x-ray upon arriving at the hospital showed a foreign body inside Sepulveda's rectum, (Medical Records at 7), and that Dr. Cubero concluded that Sepulveda had to be admitted to the hospital due to the existence of drugs in his rectum, (Medical Records at 4).[3]

Sepulveda presents nothing beyond his own testimony to dispute this evidence. He denies speaking with ambulance staff, (Pl.'s Rule 56.1 Stmt. ¶ 18), says he "has no idea why the records say" that he told hospital staff he had inserted drugs into his rectum, (Pl.'s Rule 56.1 Stmt. ¶¶ 20–21), and that he "can neither admit nor controvert the allegation" that an x-ray showed a foreign body in his rectum, (Pl.'s Rule 56.1 Stmt. ¶ 23). To credit Sepulveda's alternative account of events, a juror would have to discredit not only the officers' testimony, but also the independent statements made by emergency personnel who transported Sepulveda to the hospital, the statements and conclusions of hospital staff, and the findings of an x-ray taken when

---

[3] Courts in the Second Circuit regularly admit medical records as evidence pursuant to Federal Rule of Evidence 803(6), the business records exception to the hearsay rule. *See Duchnowski v. Cty. of Nassau*, 416 F. Supp. 3d 179, 182 (E.D.N.Y. 2018). This would include Sepulveda's medical records completed at the hospital and Sepulveda's Prehospital Care Report, completed by the emergency personnel who transported Sepulveda to the hospital. *See Ortiz v. City of New York*, No. 15-CV-2206 (DLC), 2017 WL 5613735, at *9 (S.D.N.Y. Nov. 21, 2017) (admitting prehospital care report and hospital medical records pursuant to Federal Rule of Evidence 803(6)). Although Sepulveda's statements to medical staff contained within these records would be hearsay, at least some of the statements would likely be admissible as evidence against him because they fall within the exception to the hearsay rule for statements made for the purpose of medical diagnosis or treatment, codified in Federal Rule of Evidence 803(4). *See Turner v. White*, 443 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) ("The Second Circuit has held that where the statements are made to the physician about the patient's condition and the physician relies on the statement in formulating his opinion and treatment plan, then such statements are generally admissible."); *see also Ortiz*, 2017 WL 5613735, at *9.

Sepulveda was admitted. Sepulveda thus presents no account – much less a "consistent and uncomplicated" one – to account for the overwhelming evidence against him, *Bellamy*, 914 F.3d at 746, despite the fact that Sepulveda has had "ample opportunity to explain or reconcile" his contradictory statements to medical staff and the medical evidence against him, *Rojas*, 660 F.3d at 106.

Summary adjudication is appropriate here because Sepulveda's account of events is also not supported by facts in the record beyond Sepulveda's testimony. While the fact that the drugs were never recovered from Sepulveda might appear to support his account of events, it in fact only further complicates his testimony. The foreign object previously shown inside Sepulveda's rectum had disappeared by the time of Sepulveda's second x-ray, yet Sepulveda provides no account for how this happened, what non-drug foreign object was previously observed inside his body, or why it was no longer visible at the time he was discharged. Because the Court finds "nothing in the record to support [Sepulveda's] allegations other than [Sepulveda's] own contradictory and incomplete testimony," *Jeffreys*, 426 F.3d at 555, the Court finds that Sepulveda in fact inserted a plastic bag with drugs – or something that appeared to be a plastic bag with drugs – into his rectum during the March 26, 2014, traffic stop.

### III. Fourth Amendment Claims Against Officers Based on Visual Cavity Search

The defendant officers are entitled to summary judgment on Sepulveda's § 1983 claims that the search at the 121st Precinct violated his Fourth Amendment rights. Because the Court finds that Sepulveda inserted drugs, or something that appeared to be drugs, into his rectum during the traffic stop, the arresting officers had "reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that [Sepulveda was]

16

secreting contraband inside a body cavity," and were thus "permitted to conduct a visual body cavity search." *Sloley*, 945 F.3d at 38.

## IV. Fourth Amendment Claims Against Officers Based on Hospitalization

Sepulveda also brings a § 1983 claim based on the allegation that the defendant officers arranged for his transport and admission to the hospital in order to conduct a warrantless search for the drugs they believed to be inside Sepulveda's rectum. Defendants are entitled to summary judgment on this claim as well because Sepulveda fails to present evidence to establish defendants' personal involvement in the alleged search.

In his opposition brief, Sepulveda argues that taking him to the hospital "for the purpose of performing a digital body cavity search" was a violation of his Fourth Amendment right to be free from unreasonable searches. (Opp. Mot. at 7.) As an initial matter, Sepulveda presents no evidence to support this pretextual motive for sending him to the hospital. Once they had reason to believe Sepulveda had hidden drugs in his rectum, defendants were justified in arranging for Sepulveda to be transported to a hospital. In arguing that defendants did not arrange for him to be transported to the hospital out of a concern for his safety, Sepulveda points only to the fact that officers brought him to the precinct instead of directly to the hospital. (Defs.' Rule 56.1 Stmt. ¶ 16; Pl.'s Rule 56.1 Stmt. ¶ 16.) Yet, given the officers' testimony that Sepulveda was given an opportunity to remove the drugs at the precinct, (Defs.' Rule 56.1 Stmt. ¶ 15), the stop at the precinct is not inconsistent with officers' sending Sepulveda to the hospital for his safety.

More significant, however, is the fact that Sepulveda presents no evidence to dispute defendants' claim that it was hospital staff, not the defendant officers, who made the decision to admit Sepulveda to the hospital. The evidence filed with the parties' motions shows that it was Dr. Cubero who determined that "inpatient admission" was required based on the determination

17

that Sepulveda had ingested drugs. (Medical Records at 4.) This decision was supported by the x-ray conducted by hospital staff, as well as Sepulveda's statements to emergency personnel and hospital staff. (Medical Records at 2, 7; Prehospital Care Report Summary at 3.)

The only evidence Sepulveda might point to in order to argue that defendants played a role in his hospitalization and any subsequent search is his own testimony that an unidentified doctor and an unidentified officer told him that officers were holding him at the hospital. (Sepulveda Dep. at 80.) However, these statements provide no basis for concluding that the defendant officers played any role in an alleged search at the hospital.[4] These statements are consistent with the fact that Sepulveda was still under arrest and would have to return to the precinct once discharged from hospital.[5] Similarly, Officer Alexander's testimony that Sepulveda would have been charged with possession if he had been found with drugs inside his body does not provide a basis for concluding that officers played any role in any alleged search of Sepulveda at the hospital. (Alexander Dep. at 108.) Ultimately, Sepulveda concedes that he "can neither admit nor controvert the allegation that the decision to admit plaintiff to the hospital and treat him for inserting drugs into his rectum was made by hospital personnel."[6] (Pl.'s Rule 56.1 Stmt. ¶ 27.)

Defendants have offered "concrete evidence" to support the conclusion that Sepulveda's admission to the hospital was a decision made by hospital staff for Sepulveda's safety, and not

---

[4] It is also the case that the statement of the unidentified doctor, and possibly the officer as well, would constitute inadmissible hearsay. *See* Fed. R. Evid. 802.

[5] Sepulveda acknowledges he was in fact transported to the precinct by other officers (not defendants) to be fingerprinted and later arraigned after he was discharged from the hospital. (Sepulveda Dep. at 87–88.)

[6] The Court also notes that even if Sepulveda had evidence to establish the officers' role in his admission and treatment in the hospital, it is far from clear that Sepulveda could make out Fourth Amendment search claim based on the evidence presented. Sepulveda points to no evidence that the search he claims officers wanted the hospital to conduct was ever conducted. In his motion, Sepulveda argues that officers violated his Fourth Amendment rights by sending him to the hospital "for the purpose of performing a digital body cavity search." (Opp. Mot. at 7.) Yet, on the prior page, Sepulveda notes that the hospital merely "gave him a laxative and then took a stomach x-ray." (*Id.* at 6.)

with the intention of conducting a search of Sepulveda. *Anderson*, 477 U.S. at 256. Sepulveda fails to put forth any evidence to establish that the officers had him hospitalized for the purpose of a search, played a role in admitting Sepulveda to the hospital, or in his treatment while at the hospital. Sepulveda relies only on "conclusory allegations" and "unsubstantiated speculation" to create a genuine issue of fact for trial. *Scotto*, 143 F.3d at 114. Because Sepulveda fails to plead facts to establish that the officers either "participated directly in the alleged constitutional violation" or "fail[ed] to act or remedy wrongs after being aware of them," defendants are entitled to summary judgment on Sepulveda's § 1983 claim arising out of his hospitalization.

V.      **Fourth Amendment Claims Against City of New York**

Finally, to the extent Sepulveda brings a *Monell* claim seeking to hold the City of New York liable for the misconduct alleged, the City is entitled to summary judgment on those claims. Sepulveda presents no evidence of "an official policy or custom" related to the misconduct he alleges to support *Monell* liability against the City. *Frith*, 203 F. Supp. 3d at 391. Accordingly, the City of New York is entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed to enter judgment for defendants and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       May 29, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge

19